Filed 2/5/16  P. v. Giddens CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B260780 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA081809) |
| v. | |
| ANTWUAN GIDDENS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Scott T. Millington, Judge.  Modified, and, as modified, affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Antwuan Giddens was separately charged with crimes arising out of two shootings occurring almost two years apart. The cases were consolidated for trial, and Giddens was found guilty of voluntary manslaughter and of attempted premeditated murder. He contends on appeal that it was reversible error to consolidate the cases. He also contends there was insufficient evidence to support his conviction for voluntary manslaughter. We reject these contentions, but we modify the sentence to correct an error. We affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Factual background.

#### A.      *June 7, 2010: the murder of Joshua Flynn.*

Friends Donald Clark (Take Off) and Joshua Flynn (Little Pancho) were Nutty Block Crips. On June 7, 2010, they and Clark's girlfriend, 14-year-old R.P., were going to Clark's mother's house, behind the Crenshaw mall, in Blood territory. Although they were going into Blood territory, all three were "blued out," wearing the Crips' color, because it was the day after "our hood day," the "day where the hood celebrate[s] its birth when they started." Neither Clark nor Flynn and R.P. had guns.

At least two different groups "banged" on them as they walked, although they were given passes. But, when they were in front of the Amber Motel, two men asked Clark where he was from. When Clark said he was from Nutty Block Crips, one man "banged his hood," saying Centinela Park Families or Center Park. When Clark said, " 'Okay,' " the man, later identified as Ernel Jones, repeated his "hood." Clark repeated his "hood." Jones said, " 'Fuck naps,' " a "diss for neighborhood Crip."

Incensed, Clark wanted to fight Jones, knowing that Flynn would back Clark up. R.P. tried to push an angry Clark away, telling him to leave it alone. But when Jones said, " 'Fuck all Crabs,' " gun shots rang out, fired from the man with Jones, identified as Giddens. Clark and R.P. did not hear Flynn say anything before the shots rang out. Flynn, shot twice, died.

No gun was found on Flynn, Clark and R.P. No guns were recovered from the crime scene.

Video surveillance from the motel depicted part of these events.

B. *January 2, 2012: the attempted murder of Jason McKinney.*

On the morning of January 2, 2012, Ashley Lewis and Jason McKinney were at a pawn shop on La Cienega. According to Lewis, they were in the parking lot when Giddens approached their car. McKinney said, " 'Oh, that's Antwuan.' " McKinney and Giddens "had some words." Lewis couldn't hear what was said, but nothing indicated there was "any hostility between them." Giddens, however, pointed a gun at McKinney's head and "2 clicks happened, and then he put it away." McKinney closed the car door, and the "next thing you know [Giddens] turned around and shot through the car."

Lewis was shot in each thigh. McKinney was hit multiple times, but survived. Lewis did not hear McKinney threaten Giddens, and she did not see McKinney with a gun. No guns were found at the scene or in the car. Video surveillance of the shooting was introduced at trial.

McKinney was not a gang member. He was a professional basketball player in Europe.

Giddens was arrested on January 5, 2012.

C. *Gang expert evidence.*

Police officer Kerry Tripp testified that most Black gangs in Inglewood are Blood gangs. Gang activity is responsible for 85 to 95 percent of crime in Inglewood. Center Park Bloods is an Inglewood gang, and Giddens is a member. When Officer Tripp would stop gang members, most of the time they were not armed, because they don't want to be caught with a gun.

To get into a gang, one has to "put in work," commit a crime. Committing a murder or an assault against a rival gang member or police officer generates instant respect within a gang. A gang member who wants to move up in the gang should commit a crime in front of fellow gang members "so you can get the recognition for it." Victims

3

of gang crimes are reluctant to testify against gangsters, fearing retaliation and being labeled a snitch.

The Amber Motel, where Flynn was shot, is in the territory of several gangs, including Center Park Bloods, and it's a known spot where Center Park Bloods go. As of June 2010, there were "30, 40" active Center Park Blood members. The gang's primary activities are "shootings, fights, gun possession, narcotics possession, narcotics selling, prostitution, robberies." A common tattoo for the gang is "C.P.B.," but often the C will be "crossed out" because C stands for Crips. Giddens has many tattoos, including "C.P.B." with the "C" crossed out. He also has a red "B" and "108" with the "0" crossed out as a sign of disrespect to Crips.

Although the expert was not familiar with Giddens, he testified that Giddens is a Center Park Blood, based on Giddens's gang tattoos and that he committed the subject crime with a fellow gang member. The expert, however, found no "gang intelligence" concerning Giddens; namely, no field identification cards, no arrest reports, and no reports from other officers about him. Jones, who was with Giddens the day Flynn was shot, is a Center Park Blood known as Big Sin.

Crip gang members going into Blood territory to "put in work" typically would not take a 14-year-old girl with them. But Crips who come into Blood territory "blued out" are "definitely going to get attention."

Based on a hypothetical modeled on the facts of the Flynn shooting, Officer Tripp opined that such a crime was committed in association with and for the benefit of Center Park Bloods.

D. *Defense case.*

1. Giddens's testimony.

Giddens was born on 108th Street. When Giddens was 11 or 12, he was jumped into Center Park Bloods. He remained a member of the gang until just before graduating from high school, when he was jumped out. He was offered a football scholarship to the University of Cincinnati, from which he graduated with a major in criminal justice and a minor in sociology.

4

In early 2010, Giddens's mother's house, where he grew up, was shot at.[1]  After that shooting, Giddens was robbed at a gas station near 108th Street.  After these incidents, Giddens got a gun.  He was carrying the gun on June 7, 2010.

On June 7, 2010, Giddens was at the Amber Motel, visiting Geraldine Reese.  He also met up with friends Ernel Jones and Brandon Young.  Reese left the room to get food for the group.  Because Jones or Young wanted Reese to pick up "swisher sweets," Giddens and Jones went outside to try and catch Reese.  They were waiting for Reese in front of the motel when Giddens saw Clark, Flynn, and R.P.  He noticed them because they wore blue, a Crip color in a Blood neighborhood.  Giddens did not say anything to them, but Jones did:  Jones asked Clark where he was from.  Clark and Flynn both said, " 'Nutty Block Crip.' "  Jones responded, " 'This is Inglewood Bloods, Center Park Bloods,' " "and there was back and forth thing after that."  Jones finally said " 'Fuck naps.' "  Either Flynn or Clark responded with " 'Fuck naps.' "

While Jones was exchanging these words with Clark and/or Flynn, Giddens was "on the wall waiting for [Jones] to get done talking."  Giddens didn't want to be involved, but he also didn't want to leave his friend.  Flynn "mad dogged" Giddens.  Flynn said "P.K. Pancho" to Giddens.[2]  Flynn said, " 'Fuck Slobs' " and pulled a gun from his waistband.  Thinking he was going to get shot, Giddens shot Flynn.  He did not shoot at R.P. and Clark.

After shooting Flynn, Giddens ran.  Scared that the police would not understand what happened, Giddens became a fugitive for 15 months.  During that time, he stayed with his childhood friend, McKinney, for five to six months.  McKinney was also a Center Park Blood.  Concerned that McKinney's domestic violence issues with his girlfriend would lead to the police being called, Giddens left McKinney's home.

---

[1]  Giddens's mother and sister both testified about that shooting.

[2]  Giddens's testimony was unclear as to whether Flynn or Clark said this, but inferentially it was Flynn.

After Giddens left, his friendship with McKinney fell apart, because McKinney, in January 2011, accused Giddens of burglarizing his home. McKinney sent threatening messages to Giddens via text and Facebook; for example, " 'Only time will tell. I'm going to run into you sooner or later.' " Also, " 'You fucking with a boss. You can't run from me forever. I'm going to bump into you one of these days. I'm going to knock your dumb ass down.' " McKinney threatened to " '[d]own' " Giddens, kill him.

Giddens took McKinney's threats seriously, because McKinney rode "in different females' cars" and had a "stash box" for weapons in one woman's car. Also, McKinney gave Giddens "a gun signal" with his hands while driving past Giddens. "So I believe that if I was to run into him one day he will pursue what he said he was going to do to me."

On January 2, 2012, no more than three months after McKinney made the "gun signal," Giddens was at a pawn shop. While in the pawn shop, Giddens noticed a woman who looked familiar. Outside, Giddens saw the woman with a man who looked like McKinney. Concerned that he'd been followed to the pawn shop and that McKinney would approach him from behind and to confirm that the man was indeed McKinney, Giddens walked toward McKinney. McKinney gave Giddens an "evil smirk."

Giddens decided to talk to McKinney, to try and resolve "the beef" between them. He told McKinney that he didn't burglarize McKinney's home and to stop sending threatening messages. Giddens also told McKinney he had a gun, but he didn't want trouble. McKinney said, " 'Man, I said what I said. I felt how I felt. They didn't stop making guns when they made yours.' " Giddens repeated that he too was armed and lifted his shirt to show him the gun and took off the safety. Giddens repeated he didn't want trouble and was going to walk away. McKinney warned, " 'You turn your back to me, I put a bullet in your head.' " As Giddens turned, "I seen him close his door quick, and he's going under his seat. So I turned and discharge my firearm because, in the past, this is where he keeps his weapon. He keep it on his lap." McKinney "reached under the seat for a weapon like he was . . . going to take my life." Giddens did not see McKinney with a gun. Giddens fled once again.

2.     Defense gang expert testimony.

Robert Freeman is an expert in African-American gangs. A group of Crips "blued out" walking in Blood territory would most likely be armed. If three Nutty Block Crips go into known Center Park Blood territory, "blued out," "banging their gang" and the banging escalates to " 'fuck slobs,' 'fuck crips' or 'crabs' " and "mad dogging," a bystander should be concerned. A gang member would be expected to back up a fellow gang member who is "banging back and forth."

## II.     Procedural background.

Giddens was charged separately in connection with these two events. First, an information, filed on May 23, 2012, alleged that Giddens murdered Flynn (Pen. Code, § 187, subd. (a)).[3] Gang (§ 186.22, subd. (b)(1)(C)) and gun (§ 12022.53, subds. (b), (c) & (d)) enhancements were also alleged. A second case charged Giddens with two counts of attempted murder, arising out of the shooting of McKinney and Lewis.

In September 2013, the Flynn murder trial went forward, resulting in a mistrial after the jury deadlocked.

On the People's motion, filed just one month later in October 2013, the Flynn and McKinney cases were consolidated. The amended information alleged: count 1, the murder of Flynn (§ 187, subd. (a)) with gang (§ 186.22, subd. (b)(1)(C)) and gun (§ 12022.53, subds. (b), (c) & (d)) enhancements; count 2, the attempted premeditated murder of McKinney (§§ 187, subd. (a), 664); and count 3, the attempted premeditated murder of Lewis. Gun enhancements were alleged as to counts 2 and 3 (§ 12022.53, subds. (b) & (c)).

On September 25, 2014, a jury found Giddens not guilty of the second degree murder of Flynn but guilty of voluntary manslaughter (§ 192, subd. (a)). The jury found true the gun and gang allegations. The jury found Giddens guilty of the attempted premeditated murder of McKinney and found true the gun allegations. The jury found

---

[3]     All undesignated statutory references are to the Penal Code.

7

Giddens not guilty of the attempted murder and attempted voluntary manslaughter of Lewis.

On December 3, 2014, the trial court sentenced Giddens, on count 1, to six years plus four years for the gun enhancement (§ 12022.5, subd. (a))[4] plus 10 years for the gang enhancement. On count 2, the court sentenced him to "seven years to life" plus 20 years to life (§ 12022.53, subd. (c)), consecutive to the sentence on count 1.

## DISCUSSION

### I. Consolidation of the Flynn and McKinney cases for trial.

#### A. *Additional background.*

After the jury hung in the Flynn case, the People moved to consolidate it with the McKinney case. When the trial court asked the prosecutor why he had not tried to consolidate the cases before the Flynn case went to trial, the prosecutor explained that there were "separate D.A.'s," and "I think either one or the other trial was always in a position where it wouldn't have been a timely motion." In any event, the prosecutor argued, the cases should be joined for trial because evidence was cross-admissible. Specifically, McKinney connected the cases: Giddens confessed to McKinney he killed Flynn. Giddens then shot McKinney to eliminate him as a witness. Defense counsel responded that no discovery had been turned over to substantiate such a motive for shooting McKinney. Moreover, McKinney was not called at the first Flynn trial. The prosecutor, however, represented that McKinney would be called at the second trial.

Defense counsel pointed out that there was a gang allegation in the Flynn case but not in the McKinney case. Thus, there was a risk gang evidence would prejudice defendant in the McKinney case. Similarly, defendant's defense to both cases was self-defense, and "I think . . . that they each have a devastating impact on the other," because jurors would think "that's some kind of coincidence, isn't it[?]"

---

[4] The court reduced the gun enhancement to a section 12022.5, subdivision (a), enhancement. (*People v. Fialho* (2014) 229 Cal.App.4th 1389.)

8

The trial court found that the two cases involved the same class of crimes and that "[i]t appears many things in each case will be cross admissible," "for purposes of motive with regards to [the McKinney] case and consciousness of guilt with regards to [the Flynn] case." The court considered the remaining factors and found joinder appropriate.

At trial, despite the prosecutor's representation that McKinney would testify, the People rested without calling McKinney in its case in chief. During cross-examination of Giddens in the defense case, the prosecutor asked whether, after Flynn was killed, Giddens and McKinney discussed shooting people. At sidebar, defense counsel objected that the prosecutor was eliciting McKinney's hearsay statement: "So I just want to know if Mr. McKinney is going to be called as a witness because, otherwise, he's trying to get in a hearsay statement." Notwithstanding that the prosecutor had failed to obtain McKinney's testimony in its case in chief, the prosecutor represented, "I have a good-faith basis to ask these. We are currently trying to get Jason McKinney in. We're in contact with him, and I think I have every right to ask the defendant about these prior inconsistent statements." The court found that the prosecutor could ask the "good-faith question."

The prosecutor then asked Giddens:

"Q: Do you recall having a conversation with Jason McKinney while you were staying with him, a heart-to-heart [conversation] we could call it, where the two of you discussed shooting Joshua Flynn on June 7, 2010?

"A. No, I do not.

"Q. Isn't it true that in that conversation you said to Jason McKinney, 'I shot that boy because he was wearing blue'?

"A. No.

"Q. Isn't it true that you told Jason McKinney that if you couldn't be a pro athlete you were going to be a pro gangster; isn't that true?

"A. Not at all.

"Q. Isn't it true that you told Jason McKinney that you felt that your back was against the wall because your dream of being a pro athlete was over?

9

"A. No. . . .

[¶] . . . [¶]

"Q. So you're denying that you ever said, 'I killed that boy in front of the Amber because he was wearing blue'?

"A. That's false.

[¶] . . . [¶]

"Q. And isn't it also true that after your falling out, what you were really worried about was that Jason McKinney was going to go to the police; isn't that true?

"A. No.

"Q. And so isn't it true that in your fear that Jason McKinney would go to the police you took the opportunity to try to murder him when you saw him; isn't that true?

"A. No, not at all.

[¶] . . . [¶]

"Q. Is it true that you shot Ashley Lewis on purpose to try to eliminate a witness to the murder of Jason McKinney that you attempted; isn't that true?

"A. No, sir."[5]

Giddens also testified that McKinney knew that Giddens was wanted for questioning, but McKinney never asked if Giddens killed Flynn.

B.     *The trial court did not abuse its discretion by joining the Flynn case with the McKinney case.*

The law favors consolidation of charges. (*People v. Soper* (2009) 45 Cal.4th 759, 771-772 (*Soper*); *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220; *People v. Manriquez* (2005) 37 Cal.4th 547, 574.) Section 954 therefore provides that an "accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or

---

[5]     The record does not show that defense counsel later moved, for example, to strike this testimony. But the trial court told defense counsel it could argue in closing that Giddens's testimony was uncontroverted.

more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (See also *Soper,* at pp. 769, 771.) If these statutory requirements for joinder are met, a court nonetheless may, in its discretion, order counts to be tried separately. (§ 954; *People v. Thomas* (2012) 53 Cal.4th 771, 798.) A trial court's ruling is reviewed for abuse of discretion, and, to establish such abuse, the defendant must make a clear showing of prejudice. (*Thomas,* at p. 798; *Soper,* at pp. 773-774; *Williams v. Superior Court* (1984) 36 Cal.3d 441, 447, superseded by statute on other grounds, as stated in *Alcala*, at p. 1229, fn. 19.)

To determine whether a trial court abused its discretion, we consider, first, the cross-admissibility of evidence in hypothetical separate trials.[6] (*Soper, supra,* 45 Cal.4th at p. 774.) Cross-admissibility of evidence alone is normally sufficient to dispel any suggestion of prejudice. (*Id.* at p. 775; *Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221.) If evidence would not be cross-admissible, we consider " 'whether the benefits of [the] joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] In making *that* assessment, we consider . . . : (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Soper,* at p. 775.)

Here, the statutory requirements of section 954 were met. The Flynn case and the McKinney case were of the same class of assaultive crimes; namely, murder and attempted murder. (*People v. Jones* (2013) 57 Cal.4th 899, 924; *People v. Miller* (1990) 50 Cal.3d 954, 987.) Because the statutory requirements of joinder were met, Giddens, to

---

[6]     Our review of a trial court's ruling on a severance motion is based on the record as it existed at the time of the ruling. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

establish that the court abused its discretion, has the high burden of showing clear prejudice.

Even if we assume the absence of cross-admissibility, Giddens has not met his burden. (See generally § 954.1; *People v. Capistrano* (2014) 59 Cal.4th 830, 848-849 [cross-admissibility is not the sine qua non of joint trials]; *Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1222 [absence of cross-admissibility alone is insufficient to establish prejudice].) The murder charge in the Flynn case and the two attempted murder charges in the McKinney case were not particularly inflammatory vis-à-vis the other. Giddens, however, contends that the gang allegation in the Flynn case and the consequent introduction of evidence to prove the allegation were likely to inflame the jury with respect to the McKinney case, in which no gang enhancement was alleged. Gang evidence can have a highly inflammatory impact on a jury, creating a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty as charged. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193.) But that was not particularly likely here; namely, that the gang evidence introduced as to count 1 would have a spillover effect on counts 2 and 3. The People's gang expert's opinion was limited to Flynn's murder. And although the expert testified that Giddens was a Center Park Blood, he had no evidence such as field identifications, arrest reports, and information from other officers that Giddens was an active gang member. Moreover, the Flynn murder clearly took place in a gang context, but the McKinney shooting did not. Flynn was shot after he and his fellow Crips walked through rival Blood territory "blued out" and exchanged heated gang challenges with Jones. In contrast, the McKinney shooting did not take place in a gang context. Rather, the evidence was that McKinney and Giddens were long time friends who had a falling out. There was no evidence Giddens shot McKinney for a gang-related reason.[7]

---

[7]     We also note that the jury was instructed that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303.)

12

Nor was Giddens prejudiced by the joinder of a weak case (Flynn) with a strong case (McKinney). When assessing the relative strengths and weaknesses of two joined cases, we must keep in mind that "the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried. [Citations.]" (*Soper, supra*, 45 Cal.4th at p. 781.) The cases were of relatively equal strength. In both the Flynn and McKinney cases, there was video surveillance establishing Giddens was present when the victims were shot. None of the victims—Flynn, McKinney, and Lewis—were armed. Guns were not found on the victims or at the crime scenes.

The jury's deadlocked vote in the first Flynn case does not establish that the case was weak. Although Giddens asserts the vote was six to six on the lesser included offense of voluntary manslaughter at the time of deadlock, the record is unclear. The foreperson said that "actual numbers were like six-six, five-seven, eight-four, depending on what the charge was." When the vote was eight-four, "that was the manslaughter." In any event, it is unknown why the jury deadlocked, and deadlock isn't necessarily indicative of a weak case.

Giddens also suggests that consolidation did not further the public policy of promoting efficiency and judicial economy; consolidation instead "added to judicial expenditure." It might have been more expeditious had the prosecutor moved to consolidate the cases *before* the first trial on the Flynn murder charge. Nonetheless, consolidation potentially avoided a separate trial on the McKinney case; hence, there were two instead of three trials. (See generally *People v. Bean* (1988) 46 Cal.3d 919, 939-940 [foremost among the benefits of joinder is conservation of judicial resources and public funds].) Giddens's argument that the McKinney case would have reached a pretrial disposition had Giddens been convicted in a retrial of the Flynn murder charge is speculative.

C. *Joinder did not result in gross unfairness.*

For these and additional reasons, we reject Giddens's related contention that joinder of the two cases nonetheless resulted in "gross unfairness," depriving him of due process of law. (See generally *Soper, supra,* 45 Cal.4th at p. 783; *People v. Bean, supra,* 46 Cal.3d at p. 940 [even if denial of severance was proper at the time made, we must consider on appeal the "actual impact at trial of the joinder"].)

Giddens first suggests that the prosecutor was allowed to "sneak in a confession which may or may not have ever occurred and to proffer a theory which was not supported by fact or conduct." Although, ultimately, the prosecutor's questions lacked foundation because McKinney did not testify, the trial court found that the prosecutor had a "good faith" basis to ask the questions. Specifically, the court asked for an offer of proof before the prosecutor cross-examined Giddens about his alleged confession to Flynn's murder. The prosecutor said he was in contact with McKinney and was trying to get him "in."[8] The court found that the prosecutor was proceeding in good faith. We cannot, on this record, second guess that finding. (See *People v. Hughes* (2002) 27 Cal.4th 287, 388 [while it's improper for a prosecutor to ask questions suggesting facts harmful to defendant absent a good faith belief that such facts exist, record suggested such a good faith belief].)

The prosecutor then cross-examined Giddens about his alleged confession to McKinney. Giddens, however, denied confessing to McKinney that he shot Flynn. The jury was instructed that "[n]othing that the attorneys say is evidence. . . . Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." (CALCRIM No. 222.) We presume the jury followed that instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Indeed, the jury's verdict suggests it

---

[8] McKinney had been subpoenaed and ordered back on call, but he disobeyed the order.

14

was critical of any suggestion that Giddens shot Flynn simply because Flynn was a rival gang member; shot McKinney to eliminate him as a witness; and shot Lewis to eliminate her as a witness to McKinney's attempted murder. The jury found Giddens not guilty of the second degree murder of Flynn and instead found him guilty of voluntary manslaughter. The jury therefore believed Giddens acted in imperfect self-defense. The jury also found Giddens not guilty of offenses related to the shooting of Lewis. It therefore rejected the prosecutor's suggestion that Giddens wanted to eliminate her as a witness to McKinney's attempted murder.

Next, Giddens contends that his trial was grossly unfair because consolidating the cases undermined his defense of self-defense: a jury might buy self-defense once, but twice? The jury, however, might have been more likely to believe Giddens's version of events with respect to the Flynn murder because the evidence of self-defense was, in some respects, stronger than evidence of the defense in the McKinney case. In the Flynn case, Clark testified that he, his girlfriend, and Flynn entered Blood territory "blued out" in Crip colors. Despite being "banged" on several times, they continued on. When they encountered Jones and Giddens at the Amber Motel, Clark and Jones exchanged gang challenges. Clark wanted to fight Jones, and he expected Flynn to back him up. Although Clark said he and Flynn and R.P. didn't have guns, he also said that if Flynn had a gun, Clark's gang code of honor would require him to lie about it. Clark's own testimony established that the situation was tense and fraught with danger. To some extent, it therefore buttressed Giddens's testimony he acted in self-defense.

This contrasts with Giddens's testimony in connection with the McKinney shooting. There, the evidence was that Giddens and his longtime friend McKinney had a serious falling out. When Giddens saw McKinney at the pawn shop, Giddens did not walk away; instead he approached McKinney. Although he wanted to resolve the "beef" between them, Giddens showed McKinney his gun and took off the safety. He shot McKinney, although Giddens did not see a gun. Lewis confirmed that McKinney did not have a gun. Therefore, unlike the Flynn case, Giddens's self-defense testimony was "uncorroborated."

15

Finally, we reject Giddens's argument that the gang evidence and the prosecutor's use of it to characterize him as a "predator" so undercut his self-defense testimony that reversal of the jury's finding that the attempted murder of McKinney was willful, deliberate and premeditated is required. As we have said, the gang evidence was clearly relevant only to the Flynn case. That the jury found Giddens guilty of only voluntary manslaughter of Flynn suggests that the jury did not buy the prosecutor's argument that Giddens was a predator, shooting Flynn and McKinney to make a name for himself in the gang.

## II.     Sufficiency of the evidence to support the voluntary manslaughter of Flynn.

Giddens contends there is insufficient evidence to support his conviction of voluntary manslaughter of Flynn based on imperfect self-defense. In a misapplication of the standard of review, he contends that the evidence supported only one conclusion: he killed Flynn in perfect self-defense. We disagree.

In assessing a claim of insufficiency of the evidence, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307.) Testimony of a single witness, unless physically impossible or inherently improbable, is

16

sufficient to establish a fact and support a conviction. (*People v. Allen* (1985) 165 Cal.App.3d 616.)

There was sufficient evidence that Giddens acted in imperfect, as opposed to perfect, self-defense. Perfect self-defense applies when a defendant actually and reasonably believes he is in imminent danger of being killed or of great bodily injury and uses no more force than necessary.[9] (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) But a defendant acts in imperfect self-defense if he actually believes he is in imminent danger of being killed or of great bodily injury and actually believes that deadly force is necessary to defend against the danger, but at least one of those beliefs is unreasonable. (*Ibid.*; *People v. Booker* (2011) 51 Cal.4th 141, 182.) Whereas perfect self-defense is a complete defense, imperfect self-defense is a " 'theor[y] of partial exculpation' that reduce[s] murder to manslaughter by negating the element of malice." (*People v. Moye* (2009) 47 Cal.4th 537, 549.)

Here, Giddens testified he actually believed he was in imminent danger of great bodily injury. His friend, Jones, was exchanging gang challenges with Clark, who was accompanied by Flynn. Giddens saw Flynn draw a gun from his waistband. Clark and R.P., however, testified that Flynn did not have a gun, and no gun was found on Flynn or at the crime scene. This was sufficient evidence from which the jury could conclude, for example, that Giddens actually believed he was in danger, but his belief he needed to use deadly force against the danger was unreasonable.

Giddens, however, argues that his "reasonable" belief Flynn had a gun was uncontroverted. Giddens primarily cites Clark's testimony that even if Flynn had a gun, Clark's gang code of honor required him to lie about it. But Clark's credibility and the determination whether Flynn had a gun were quintessential issues for the jury. Defendant's argument that the evidence leads to only one conclusion—Flynn had a gun and defendant therefore acted in perfect self-defense—is an improper request we reweigh

---

[9] The jury was instructed on second degree murder, voluntary manslaughter, and perfect and imperfect self-defense. (CALCRIM Nos. 520, 571.)

17

the evidence and reassess the credibility of witnesses. (*People v. Friend* (2009) 47 Cal.4th 1, 41.)

## III. Modification of sentence.

On count 2, the attempted premeditated murder of McKinney, the trial court imposed "seven years to life" plus 20 years for the gun enhancement. The sentence, however, for attempted premeditated murder is life with the possibility of parole.[10] (§ 664, subd. (a).) The trial court also imposed 20 years for the gun enhancement, under section 12022.53, subdivision (c). The abstract of judgment, however, incorrectly states the gun enhancement was imposed under subdivision (d) of section 12022.53. The abstract of judgment must be corrected. (See generally *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [an unauthorized sentence may be corrected on appeal].)

---

[10] The trial court derived its "seven years to life" sentence from section 3046, which establishes minimum terms before eligibility for parole.

## DISPOSITION

The judgment is modified to reflect that the sentence imposed for the attempted premeditated murder of McKinney is life with the possibility of parole consecutive to 20 years for the gun enhancement under section 12022.53, subdivision (c). The clerk of the superior court is directed to modify the abstract of judgment and to forward the modified abstract to the Department of Corrections. As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

LAVIN, J.

19